## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**CYNTHIA V. GRADO,**
      **Plaintiff,**

**vs.**                                                                                      **Civil No. 02-1629 RLP**

**JO ANNE B. BARNHART, Commissioner**
**of the Social Security Administration,**

      **Defendant.**

### MEMORANDUM OPINION AND ORDER

1.      Plaintiff, Cynthia V. Grado ("Plaintiff" herein), filed applications for disability income and supplemental security benefits on September 1, 2001.  Her applications were denied initially, on reconsideration, and by an Administrative Law Judge ("ALJ" herein) following a hearing.  Plaintiff sought review by the Appeals Council, which declined to consider her claim on October 23, 2002.  Accordingly, the ALJ's decision is the final decision of the Commissioner of Social Security.

2.      The matter  before the Court is Plaintiff's Motion to Reverse or Remand Administrative Agency Decision. (Docket No. 9).  For the reasons stated herein Plaintiff's Motion is denied .

### FACTUAL BACKGROUND

3.      Plaintiff was born on March 9, 1971. (Tr. 74).  She has a GED and  has worked as a certified nurse's assistant.  She stated that she stopped working in August 1997 because of back pain, and because she wanted to get a college education.  (Tr. 90).   She completed three years of college classes toward a degree in social work as of the date of her administrative hearing on June 7, 2002. (Tr.  96, 34, 36).  Plaintiff alleged a date of onset of disability of August 1, 1997.  (Tr. 74).  In medical histories she gave to four physicians, she indicated that she began experiencing back pain in March 1998 (Tr. 138, 240,156) or in 1998 (Tr. 294).

4.      Plaintiff alleges that she suffers pain and functional limitation due to disc herniations at several levels of her spine, one level of which has been treated with microdiscectomy and fusion.   She testified that she has constant neck pain and headache, numbness and tingling of both arms into her fingertips, constant low back pain, and numbness and tingling in both legs into her toes, which limits her to walking one block, standing  for 30-45 minutes at a time, sitting  for 30-60 minutes at a time and lifting no more than 20 pounds.  (Tr. 37, 39, 40, 52, 90).   She has also been treated for depression.  (Tr. 42).

5.      On March 7, 1998, a CT of Plaintiff's spine noted a mild disc bulge at the  L4-L5 level.[1] (Tr. 144-145).   Plaintiff was seen by R.E. Pennington, M.D. PhD., on June 3, 1998, complaining of a three month history of severe back pain with radiation down her left leg, aggravated by activity or prolonged standing.  Dr. Pennington initiated a conservative course of treatment, including pain management, exercise and steroid injections.  (Tr.  156-159, 153-154).  Plaintiff initially improved but her pain returned by July.  An MRI of Plaintiff's lumbar spine in August was read as normal. (Tr. 147).  Dr. Pennington diagnosed lumbar strain and urged more physical activity.  (Tr.150-152).

6.      There are few medical records thereafter until March 2000, when a disc bulge at  T11-12 was identified by MRI at Carlsbad Regional Medical Center.  (Tr. 173).  This was confirmed by repeat MRI at Covenant Medical Center on March 1, 2000.  (Tr. 220).  Plaintiff was referred to Dr. Matt Wills, a neurosurgeon.  (Tr. 220, 294-295).  She advised him that her back pain was currently severe, and was aggravated by standing or sitting and relieved by lying down.  (Tr. 186).  Dr. Wills also noted radiation of pain into the left flank, increasing numbness and paresthesia of the left lower

_____

[1]The radiology reports stated that exiting nerve roots were well delineated w/ no deformity of the dural sac or obliteration of the anterior epidural fat at the level of the exiting nerve roots, and that no intradural or extradural masses or paravertebral masses were noted.

extremity, intermittent leg pain, difficulty sleeping, and exacerbation of flank pain with bending or extension.  (Tr. 198, 201).  Microdiscectomy and fusion at T11-12 was performed on May 1, 2000. (Tr. 186, 202).  As of May 11, Plaintiff's back pain had markedly improved and she no longer complained of numbness or tingling in the lower extremities.  (Tr. 290).  Repeat MRI was performed on July 18 due to complaints of persistent leg pain and numbness.  It disclosed :

1. Status-post T11-T12 discectomy with abundant enhancing scar tissue filling the left neuroforamen. The possibility of nerve rootlet compression cannot be unequivocally excluded by this examination.

2. L4-5 minimal left paracentral contained disc protrusion with minimal compromise of the ipsilateral neuroforamen.

3. L5-S1 Focal central contained disc protrusion without convincing evidence for nerve rootlet displacement or compression.

(Tr. 187).

Dr. Wills evaluated Plaintiff  immediately after this MRI.  He felt her leg complaints might be neuropathic in origin, as well as due to disc disease at the L4-L5 and L5-S1 levels. She was started on Neurontin[2] and physical therapy to recondition her back.  (Tr. 288).

7.   Plaintiff was evaluated by the Department of Vocational Rehabilitation in the Fall of 2000. (Tr. 309-310).  DVR found her to be "significantly disabled" stating:

Client experiences pain in the lower and mid back, and some numbness in her right leg and feet upon any strenuous exercise, involving bending, twisting, climbing, pulling, pushing or lifting.  She is restricted to lifting no more than 20 lbs.  She has some anxieties related to re-injuring herself, thereby restricting herself for caution's sake. Her post surgical status is, apparently, fairly stable, but she is definitely not able to do the lifting, bending, and prolonged standing required of a nurses aid, which is her primary work experience.

---

[2]Neurontin is an anti-seizure medication.  1999 Physicians' Desk Reference at 2301.  It has numerous off label uses, including treatment of neuropathic pain.  *http://home.tampabay.rr.com* /lymecfs/nfaq.htm; *www.plsgroup.com/dg/D6AC6.htm.*

* * *

Client is in need of developing new job skills in an area appropriate to her physical limitations. . .

(Tr. 309-310).

8.      Plaintiff returned to Dr. Wills on March 6, 2001, ten months after her back surgery.  At that time she stated that the pain she complained of at her July 2000 visit had resolved, and that she had been doing extremely well until a fall three weeks earlier.[3]  Plaintiff's physical examination was unremarkable.  Dr. Wills felt she had not suffered a recurrence of her T11-12 disc injury, gave her pain medication and asked her to return in one month. (Tr. 287).   When she returned on April 3, 2001, she complained of suboccipital neck pain, mid thoracic and lumbar pain with some intermittent radiation down the left leg.  She stated that she was pain free for days at a time, but that at times her pain was so severe that she needed to change from an upright to sitting position.   Her neurologic examination was unremarkable except for some increased deep tendon reflexes in knee and ankle jerks.  Her sensation was well preserved, she walked with a steady gait and was able to heel-toe walk without difficulty.  Dr. Wills reviewed imaging studies of Plaintiff's back that showed a disc bulge at L4-5 involving the L4 and L5 nerve roots.  Despite these findings, Dr. Wills felt that her back and neck pain were caused by a too-soft mattress, and that her leg pain was intermittent and not severe. He advised her to increase her activity level, stating that her sedentary activity level was aggravating her pain.  (Tr. 285; 225).

9.      From April through September 2001 Plaintiff was treated by a chiropractor, Dr. Burgess, and

---

[3]This improvement in Plaintiff's condition is supported by a May 9, 2001 report from the Department of Vocational Rehabilitation, which was providing educational assistance to Plaintiff.  The report states that Plaintiff was doing C-average work in college courses, that her early grades were affected by pre- and immediate post-surgical pain, and that her later grades had been consistently higher.  (Tr. 305).

by an osteopathic physician, Dr. Grafe, for complaints of back and neck pain.  Dr. Burgess did not

record physical examinations. (Tr. 180).  On April 30, 2001, Dr. Grafe noted muscle spasm and point

tenderness in the cervical spine, however Plaintiff had no abnormalities in the thoracic or lumbar

spine, and no recorded neurological problems. (Tr. 250-251).  On May 24 an MRI performed at

Eastern New Mexico Medical Center noted a mild disc protrusion at C5-6, with no desiccation or

involvement of the neuroformina.  (Tr. 247).  Plaintiff was seen in an emergency room twice in July

2001, once for complaints of low back pain radiating down her legs and numbness in her toes (Tr.

224) and once for complaints of severe head ache, neck pain and stress. (Tr. 223).  She returned to

Dr. Grafe on August 22 with complaints of headache, neck pain and lower thoracic pain of two-three

days duration and frequent urination with urgency.  He noted stable muscle spasm and point

tenderness in the cervical spine, and bilateral point tenderness on the lower thoracic spine.  (Tr. 245-

246).  The following month Plaintiff applied for disability insurance benefits and supplemental security

income benefits.  (Tr. 74, 358).

10.     There is little documented medical care related to Plaintiff's back condition following her

applications for benefits.  On October 29, 2001, she complained of back pain to her gynecologist.

(Tr. 267).  On  December 27, 2001, she returned to Dr. Wills complaining of more pain.  He

recorded:

> She has been exercising on a regular basis.  She described this mostly as doing low
> back range of motion exercises and walking.  Several months ago she was feeling well
> and tapered her *Ultram*[4] down to nearly off.  She has since resumed taking one or two
> tablets on occasion.  She was taking six a day with good result.
>
> Today she is complaining of more pain in her thoracic spine as well as in her lumbar

---

[4]*Ultram* is a prescription analgesic indicated for the management of moderate to moderately severe
pain. *1999 Physicians' Desk Reference*, at 2254-2257.

> spine and still complaining of suboccipital headaches.  She continues to have burning pain around her right flank and intermittent pain down her left leg.  During our conversation it does not sound as if any one of these pain syndromes takes precedence to her over another.
>
> On physical examination she stands and walk (sic) easily.  Her movements are fluid.  She is able to bend at the waist and get down to touch her ankles.

(Tr. 283).

Dr. Wills advised Plaintiff to increase *Ultram* to six per day and to begin aquatic exercise.  He also noted MRI findings of degenerative disc disease at L4-5 with left sided disc protrusion, which he felt might be causing her low back and leg symptoms. He asked her to return in a month, and stated that he would not recommend surgery due to the diffuse nature of her pain complaints.

11.     There is no indication that Plaintiff returned to Dr. Wills.  She did consult Dr. Grafe in February and May 2002.  In February he diagnosed  "unspecified myalgia and myositis" based on "muscle spasm and point tenderness - stable" in the cervical spine and bilateral point tenderness in the lower thoracic area.  (Tr. 354).  The cervical spine findings resolved by May, while the thoracic findings continued.  (Tr. 349).

12.     Plaintiff began mental health counseling in October 2001, to address marital problems.  (Tr. 344-346, 325-328).  She was noted as somewhat anxious but not particularly depressed. (Tr. 344).  An evaluation based on a November 6, 2001, interview indicated that she had no real medical, employment, alcohol, drug or legal problems, had moderate family/social problems for which some counseling was indicated, and slight psychological problems probably not requiring treatment.  (Tr. 330).

13.     Plaintiff's daily activities include driving her nieces to school, attending school, performing

household chores[5], doing homework and socializing. (Tr. 111-112).  She also likes to cook, decorate, bake and watch movies.  (Tr. 113).  Plaintiff indicated that she had no difficulty following and carrying out instructions, or getting along with others.  (Tr.114,108). Her sister stated that typical daily activities include performing household chores, attending school, seeing doctors, visiting with family and running errands, and that she needed help with heavy objects.  (Tr. 117).

## ALJ'S DECISION

14.     The ALJ found that Plaintiff's spinal condition was a severe impairment; that this impairment did not meet or equal a Listed Impairment; that Plaintiff retained the residual functional capacity ("RFC" herein) for the full range of light work,  and  that Plaintiff could not perform her prior work. The ALJ then applied the Medical-Vocational Guidelines, Rule 202.21, 20 C.F.R. Part 404 Subpt. P, App. 2, and determined that Plaintiff was not disabled.

## ISSUES ON APPEAL

15.     Plaintiff contends that the ALJ's credibility determination is not supported by substantial evidence, and that the ALJ erred by applying the Grids in light of her nonexertional impairments.

## STANDARD OF REVIEW

16.     The Social Security Act provides that final decisions of the Commissioner shall be subject to judicial review. 42 U.S.C. §405(g).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . "  Id.  I review the Commissioner's decision to determine only whether the decision is supported by substantial evidence and whether correct legal standards were applied.  *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994).

---

[5]Laundry, cooking, house cleaning (Tr. 125); shopping, food preparation (Tr. 127); vacuuming, dusting, washing dishes (Tr. 46).

Substantial evidence is more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable man might accept to support the conclusion. *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988). The determination of whether substantial evidence supports the Commissioner's decision is not a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes a mere conclusion. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). I will not reweigh the evidence, but will examine the record as a whole, including whatever in the record fairly detracts from the weight of the Commissioner's decision in order to determine if the decision is supported by substantial evidence. *Glenn*, 21 F.3d at 984.

17.     The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. *Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir. 1988). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir. 1989). The burden of proof is on the claimant through step four, and shifts to the Commissioner at step five. Id.

## ANALYSIS

### The ALJ's Credibility Determination Is Supported by Substantial Evidence

18.     The ALJ found that Plaintiff's complaints of functional limitation were not fully credible in light of the record as a whole." (Tr. 20). In reviewing this determination, I must "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Sec'y of Health & Human Serv's*, 933 F.2d 799, 801 (10th Cir. 1991). "Credibility is the province of the ALJ." *Hamilton v. Sec'y of Health & Human Serv's*, 961 F.2d 1495, 1499 (10th Cir. 1992). "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Huston v. Bowen*, 838 F.2d 1125, 1131,

1133 (footnoted omitted) (10th Cir. 1988).  The ALJ must "articulate specific reasons for questioning the claimant's credibility" where subjective pain testimony is critical.  *Kepler v. Chater*, 68 F.3d at 391 (internal quotations omitted) *but see Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000)(*Kepler* does not require formalistic factor-by-factor recitation of the evidence.)

19.    In discussing the evidence, the ALJ referred to the following:

–     Department of Vocational Rehabilitation report indicating that Plaintiff could lift up to 20 pounds.  (Tr. 19, referring to Tr. 309). Plaintiff concurred with this description of her lifting limitation.  (Tr. 90).

–     Unremarkable examination on April 3, 2001,  combined with Plaintiff's ability to walk with a stable gait and to heel/toe walk without difficulty.  At that time her pain complaints were attributed to her mattress, her leg pain was described as intermittent, she was pain free for days at a time, and she was advised to be more physically active. (Tr. 19, referring to Tr.  285).

–     Plaintiff's statement on December 27, 2001, that she had been exercising regularly. On examination on that date she was able to walk and stand easily with fluid movements, and bend at the waist and touch her ankles, and she was urged to begin aquatic exercise.  (Tr. 19-20, referring to Tr. 283).

–     Plaintiff's report to Dr. Wills that her pain had been controlled through use of *Ultram*. (Tr. 20, referring to Tr. 283).

–     Although Plaintiff testified that *Ultram* caused drowsiness, this side effect did not significantly interfere with her college studies.  (Tr. 20, referring to Tr. 43, 305).

–     Plaintiff's significant daily activities:  She attends college classes, performs household chores including washing dishes, vacuuming, dusting, laundry and cooking, drives children to school, does homework and runs errands.  (Tr. 20, referring to Tr. 111-118; 46).

Based on the foregoing, I find that the ALJ's rejection of Plaintiff's credibility is supported by substantial evidence.

Substantial Evidence Supports the ALJ's Finding that Plaintiff Retains
the RFC for the Full Range of Light Work;   Accordingly, the ALJ
<u>Correctly Applied the Grids in Determining that Plaintiff Was Not Disabled.</u>

20.     The ALJ determined that Plaintiff had no non-exertional limitations and that she retained the RFC for the full range of light work.[6]  (Tr. 20, 22).  Plaintiff contends  that the ALJ ignored her "severe limitations using her hands, standing, walking, bending, stooping and kneeling" and the impact of her depression, and therefore the ALJ erred in utilizing the Medical Vocational Guidelines (grids) at step five of the sequential evaluation process to reach his determination of no disability.

21.     The grids set forth rules that identify whether jobs exist in the national economy, taking into account a particular claimant's RFC, age, education, and work experience.  *Gossett* 862 F.2d at 806. As such, the grids are a shortcut obviating the need for vocational expert testimony.  *Trimiar v. Sullivan*, 966 F.2d 1326,1332 (10th Cir. 1992).   While  I agree that the grids are not determinative in all cases, Plaintiff's argument that the presence of  a nonexertional impairment always precludes sole reliance on the grids is too broad.

> " [T]he mere presence of a nonexertional impairment does not automatically preclude reliance on the grids."   The presence of nonexertional impairments precludes reliance on the grids only to the extent that such impairments limit the range of jobs available to the claimant.

*Gossett*, 862 F.2d at 807-08 (quoting and citing *Channel v. Heckler*, 747 F.2d 577, 582 n. 6 (10th Cir.1984)).

22.     The ALJ found that Plaintiff's depression was a non-severe impairment, and supported that

---

[6]. . . [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weight up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. . .  20 C.F.R.§§404.1567(b); 416.967(b).

finding with a detailed review of the record. (Tr. 17-18; See ¶12, *supra*)   Substantial evidence supports the ALJ's conclusion that while Plaintiff has pain, that pain is not disabling.   On July 15, 1998, Dr. Pennington's examination noted that Plaintiff had full range of motion of the lumbar spine, and only minimal discomfort on flexion, extension and lateral bending. (Tr. 151).   There is no record of reported back pain from August 1998 until the Fall of 1999.   Although Plaintiff subsequently developed an operable back condition and was incapacitated for a time due to back surgery, her condition improved to the point that she returned to school, exercised on a regular basis  and performed significant activities with pain controlled with medication in less than twelve continuous months.   See §42 U.S.C.  423(d)(1)(A).   *See Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir.1990) (claimant's testimony regarding severity of pain must be consistent with medical records); *Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1349 (10th Cir.1990) (medical evidence must corroborate claimant's testimony that she was unable to work).   Finally, no treating physician assigned postural limitations and one treating physician consistently advised her to be more active.   Finally, agency physicians determined that Plaintiff retained the residual functional capacity for light work. (Tr. 275-282). *See SSR 96-6p*, 1996 WL 374180.

23.     Substantial evidence supports the ALJ's conclusion that nonexertional limitations do not prevent Plaintiff from engaging in the full range of light work   Accordingly, the ALJ applied correct legal principles when he applied the grids at step five of the sequential evaluation process.

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse or  Remand (Docket No. 9)

is denied.

**Richard L. Puglisi**
**United States Magistrate Judge**
**(sitting by designation)**

12